UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARINE TRAVELIFT, INC.,

        Plaintiff,

  v.                                     Case No. 10-C-1046

MARINE LIFT SYSTEMS, INC.,

        Defendant.

**DECISION AND ORDER GRANTING
DEFENDANT'S MOTION TO STRIKE**

This case is before the court on the motion of Defendant Marine Lift Systems, Inc., ("MLS") to preclude the opinions and testimony of Dr. Charles Breeden, Plaintiff Marine Travelift, Inc.'s (MTI's) expert witness on damages. The underlying dispute concerns the alleged breach of a distributorship agreement. MTI is a manufacturer of marine hoist and industrial lift equipment. In September 2007, MTI entered into a distributor agreement with MLS under which MLS agreed to serve as a non-exclusive distributor of MTI's marine hoist equipment in Georgia and several counties in Florida. Based on its belief that MLS was sharing trade secrets and/or confidential proprietary information with its competitors and customers, MTI terminated the agreement and filed this action. The amended complaint alleges seven different causes of action: breach of contract, misappropriation of trade secrets information, misappropriation of confidential and proprietary information, unfair competition, tortious interference with contractual relationships, unjust enrichment/misappropriation of business value, and for accounting, constructive trust, and

declaratory and injunctive relief. (Am. Comp. ¶¶ 27-70, ECF. No. 16.) MLS has denied that it disclosed confidential information and filed a counterclaim for damages it claims it sustained as a result of MTI's wrongful termination of the distributorship agreement, but MLS' counterclaim is not at issue here.

## I. CHALLENGED OPINIONS

MTI has named Dr. Breeden, an economics professor who teaches at Marquette University, as an expert witness who will offer opinions at trial on potential lost profits and damage to goodwill that MTI is likely to sustain in the future as a result of System's disclosure of confidential information. MLS does not challenge Dr. Breeden's qualifications as an expert witness in the area of lost profits, and in fact it is clear from his curriculum vitae that he is well qualified in the field of economics. Instead, MLS challenges the reliability of the opinion Dr. Breeden is offering in this case. More specifically, MLS contends that Dr. Breeden performed no independent analysis in the case, but has been retained simply to serve as a mouthpiece for Erich Pfeifer, MTI's President and CEO, and Peter Kerwin, MTI's CFO (collectively "the executives"). As a result, MLS contends that Dr. Breeden's opinions are neither "based on sufficient facts or data," nor "the product of reliable principles and methods" as Fed. R. Evid.702 requires.

The substance of Dr. Breeden's opinions are set forth in the report he provided pursuant to Fed. R. Civ. P. 26(a)(2)(B). It is clear from the report that Dr. Breeden was not asked to perform an independent analysis and determine MTI's lost profits himself. Instead, his assignment was "to evaluate a projection of potential lost profits and damages due to inappropriate actions taken by Marine Lift Systems, Inc." (Breeden Report 2, ECF No. 127-4.) The "projection" he was asked to

2

evaluate was that of the executives. Dr. Breeden was asked "to evaluate the principles and methods of forecasting employed by [the executives] in deriving their projections of lost or impacted sales of units of its products." (*Id.*) The projection of lost profits provided by MTI's executives is set forth on an attachment to Dr. Breeden's report. (*Id.* at 16-17.) The executive's projections range from a low of $563,833 in lost profits to a high of $4,085,000 over an eighteen-month period.

To arrive at their projections, the executives assumed that MLS' disclosures would impact 26% of Marine Travelift's worldwide sales. They then used two different methods for calculating "potential lost margin" under two different scenarios for an eighteen-month period. The first method assumed that MTI would sell the same number of units, but only by significantly discounting the price of 26% of the units it sold on a worldwide basis. The amount of the discount assumed was based on a discount that MTI claims it was forced to provide one of its major customers, Skipper Buds, as a result of confidential pricing information that MLS had allegedly disclosed to one of MTI's competitors. MTI alleges that in April 2011 it gave Skipper Buds a discount of $558.25 per lifting ton on a sale of a marine lift product as a result of MLS' disclosure of its proprietary information to Hoist Lift Truck, Inc. Based on this single sale, the executives assumed that MTI would need to provide a "Skipper-Buds discount" on all direct sales of its marine hoist products in the impacted market (*i.e.*, 26 percent of its worldwide market share). The executives also assumed that MTI would need to apply the same discount, multiplied by 1.5 times per lifting ton, to its industrial lift products. The second method assumed that the impacted sales would be simply lost.

The two scenarios to which the two methods were applied differed with respect to the number of sales that were forecast. For the first scenario, the executives assumed that MTI's

3

worldwide sales would return to their 2008 level, when MTI enjoyed its best year and sold 83 units. Extrapolating this number over 18 months, the executives arrived at a total of 125 units, 32 of which (.26 x 125) would be impacted. For the second scenario, the executives started with 33 units, which was a rough average of MTI's sales over the three-year period of 2009 to 2011. They then extrapolated that number to 50 units over an eighteen-month period, 13 of which (.26 x 50) would be impacted. Applying the first "discounted sales" method to the two different scenarios, the executives arrived at a "potential lost margin" of $1,412,373 for the rosy scenario and $563,833 for the gloomier scenario. Using the second "lost sales" method, they calculated MTI's "potential lost margin" at $4,085,000 for the first scenario and $1,638,000 for the second.

In his report, Dr. Breeden briefly described the methods the executives had used and the scenarios to which they had applied them. He summarized his opinions as follows:

> The projection by MTI of "Potential Lost Margin Related to Marine Lift Systems Illegal Actions" reflects a reasonable, accurate and reliable methodology for assessing potential business damages in instances of business interruption such as that at issue in this case and is based on reliable principles or data. The principles and methods employed by MTI in forecasting the potential market for marine and commercial lifts over the next 18 months also reflects a reasonable and reliable methodology based on reliable principles or data for such business forecasting. Using the principles and methods employed by MTI, it is my opinion to a reasonable degree of certainty in the area of business economics that the potential for lost profits to MTI due to the wrongful conduct of MLS is in the range of $563,833 to $4,085,000 and that MTI also faces significant risk of loss of its business goodwill. To the extent that future incursions of MLS and affiliated companies either exceed or fall short of MTI's projections, actual future business damages sustained by MTI may vary accordingly.

(*Id.* at 3.)

These are the opinions that MLS asks the court to exclude on the ground that they are based on insufficient data and are not the product of reliable principles or methods.

4

## II.  LEGAL FRAMEWORK

Rule 702 of the Federal Rules of Evidence permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Federal trial courts are to serve as gatekeepers to bar expert testimony that is not sufficiently reliable or relevant to issues in the case, or that is offered by a person not sufficiently expert in the field of study that his testimony concerns.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Determining whether expert testimony is sufficiently reliable for a jury to consider requires a flexible approach, and district courts have "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (internal citations omitted).

The Seventh Circuit recently reiterated the inquiries the district court must make before admitting expert testimony:

> First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be

5

based on sufficient facts or data and reliable principles and methods; and fourth, the
expert must have reliably applied the principles and methods to the facts of the case.

*Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013). When the proffered "testimony's factual basis, data, principles, methods, or their application are sufficiently called into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

### III. ANALYSIS

Dr. Breeden's proposed testimony concerning the "potential lost margin" calculations performed by MTI's executives does not meet Rule 702's threshold relevance and reliability standards. It fails to meet the relevance standard because Dr. Breeden has only offered an opinion as to "*potential* business damages" that MTI might sustain in the future. (ECF No 127-4 at 3.) Potential means possible: "existing in possibility; capable of developing into actuality." Merriam-Webster's Collegiate Dictionary, 912 (10th ed. 1999). Dr. Breeden offers no opinion that business losses will in fact occur as a result of MLS' alleged disclosures of confidential information or what they will in fact be. Evidence that MTI will suffer business damage is relevant to MTI's claim; evidence that it might suffer such a loss is not. As explained in Wisconsin's pattern jury instruction:

> The law allows only such damages as have been proved by the greater weight of the credible evidence, to a reasonable certainty. The burden to prove damages is not satisfied by evidence which merely shows that something might or might not exist or might or might not occur in the future. Mere possibilities leave the resolution of the issue of damages for future profits in the field of speculation and conjecture to such an extent as to afford no basis for an inference; and, in the absence of at least such inference, there is no sufficient basis for awarding damages for the loss of future profits.

6

WIS JI-CIVIL 3725 (2008); *see also Pleasure Time, Inc. v. Kuss*, 78 Wis.2d 373, 387, 254 N.W.2d 463 (1977); *De Sombre v. Bickel*, 18 Wis.2d 390, 398, 118 N.W.2d 868, 873 (1963) ("Neither a court nor a jury as the trier of the facts can determine damages by speculation or guesswork. The trier of the fact may make a reasonable estimate of the damage based on relevant data and evidence . . . . Damages must be proven with reasonable certainty."). Here, because Dr. Breeden offers only the opinion that lost profits in the range calculated by the experts are possible, his testimony to that effect is not relevant. For this reason alone his opinions on the issue are inadmissible. But there are additional reasons his opinions must be excluded.

Dr. Breeden's opinion as to MTI's potential business damages is also inadmissible because it fails to satisfy *Daubert*'s reliability standard. It fails to meet the reliability standard because Dr. Breeden offered no basis within his knowledge or experience to support the assumed percentage of sales that will be impacted, and there is insufficient data to support the discount valuation method. In fact, it appears that Dr. Breeden did not question any of the assumptions or calculations MTI's executives utilized in reaching their calculation of potential future lost profits. (Breeden Dep. 71:9-16, ECF No. 127-5.) Most glaringly, Dr. Breeden did not question the 26 percent loss exposure assumed by the executives. There isno explanation for the 26 percent figure in his report, and it is clear from his deposition that he simply accepted the executive's assumption:

> Q: You also used a 26 percent loss exposure under both potential lost margin analysis, correct?
>
> A: Right.
>
> Q: Can you explain – explain that figure?

7

> A: Yes. That's the translation . . . by Mr. Kerwin and Mr. Pfeifer of the impact of the actions on to that worldwide market potential to target it to specifically the actions of Marine Lift Systems and the territories that are under consideration here.
>
> . . .
>
> Q: So Marine Travelift came up with the 26 percent loss exposure, correct?
>
> A: That's correct.
>
> Q: Did you do anything to verify the validity of the projected 26 percent loss exposure?
>
> A: No.

(Breeden Dep. 82:7-83:1.)

Although Dr. Breeden states in his report that his opinions are based on his "academic training, thirty years of academic research and teaching, and thirty years of experience as an independent expert giving consultation and testimony regarding economic damages" (ECF No. 127-4 at 2), he fails to explain what principle or method within the body of knowledge he has gained supports and explains the executives' assumption that MLS' disclosures will impact 26% of MTI's sales. In his report, there is no discussion of the propriety of using the 26 percent loss exposure figure, much less is there any discussion concerning the figure. Instead, he simply includes it in his report without explanation.

An expert's general appeal to his education and experience is not enough to establish the reliability of his opinions. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Clark v. Takata Corp.*, 192 F.3d 750, 759 n 5 (7th Cir. 1999) ("A supremely qualified expert cannot waltz into the

courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.").

The need for explanation and analysis is particularly strong in a case such as this where one would expect actual evidence of losses if in fact MLS' disclosures harmed MTI. If, as MTI alleges in its amended complaint, MLS began disclosing its confidential information more then two years ago (Am. Compl. ¶ 18, ECF No. 16), either MTI or Dr. Breeden should be able to present data or evidence to support a claim of lost profits. Indeed, because more than eighteen months have passed since MLS' alleged disclosures, there should be actual data that demonstrates whether the assumptions underlying the executives' projections are accurate. If the executives' projections were accurate, we should by now have actual damages, not mere predictions of future damages. No such evidence or data has been offered by MTI. And MLS contends that notwithstanding its claim that it faces lost profits resulting from increased discounts and lost sales as a result of MLS' disclosures, MTI has actually "increased its prices and further claims to have increased unit sales and revenues since commencing this action." (ECF No. 167-1 at 9.) In any event, having failed to provide any explanation based on his education or experience as to why the executives' assumption of a 26% loss exposure was reasonable, the opinions based on that assumption may not be offered.

Dr. Breeden's opinion is also inadmissible because it is not supported by sufficient data. The discounted sales method is supported by only one sale, the Skipper-Buds sale, that occurred back in April 2011. MLS makes a strong argument that other factors entirely unrelated to any conduct on its part explain why MTI was forced to offer Skipper-Buds the discount. But even assuming the discount could be tied to information MLS disclosed, one sale more than two years ago would hardly seem a sufficient basis for the assumption underlying the discounted sales method

9

proffered by the executives. Based on that one sale, Dr. Breeden accepted the executives' assumption that MTI would be forced to accept a $558.25 per lift ton discount on 26% of its entire marine product line, along with a multiplier for its industrial lift equipment, even though the distributor agreement only pertained to the sale of plaintiff's marine hoist equipment. Nothing in Dr. Breeden's report explains why the Skipper-Buds discount, which pertained to the sale of a single marine hoist product, would require MTI to offer the same discount in direct sales of its industrial lift products in light of the fact that these products are sold to different customers in different markets than that of MTI's marine hoist products. (Breeden Dep. 70:14-22.) Notably, Dr. Breeden testified that the reason for applying the Skipper-Buds discount to MTI's industrial products in the lost profits analysis was based solely on "the representations by Mr. Pfeifer and Mr. Kerwin." (*Id.* at 104:24-25.) And again, the assumption appears to have been proven incorrect by the actual sales that MTI has had since the Skipper-Buds transaction.

MTI also suggests that Dr. Breeden was entitled to rely on the calculations of its loss exposure and sales projections by the executives because they too will testify as experts at trial. Of course, if Mr. Kerwin and Mr. Pfeifer are qualified to testify as experts concerning their calculation then the same evidence may be allowed. But that is not the issue before the court. The question presented in MLS' motion is whether Dr. Breeden can offer as his own expert opinion the projections that the executives prepared. For the reasons already explained, the court concludes he may not.

MLS also moves to strike Dr. Breeden's opinion as it relates to MTI's loss of goodwill. Dr. Breeden did not outline any valuation of what MTI's economic damages may have been concerning its business goodwill. He merely opines that MTI faces a "threat" that "exists far into the future"

10

that the MLS' allegedly wrongful actions "may result in a conversion of business away from MTI and to MLS and its affiliated companies, or to other competitors in the industry." (Breeden Report 5.) As it stands, Dr. Breeden's opinion regarding loss of goodwill is too speculative and uncertain to satisfy the legal standards for proving damages, especially as it does not appear he made any attempt to approximate the value of plaintiff's business goodwill much less estimate the amount of damages. Dr. Breeden also acknowledged in his testimony that he could not offer an opinion to a reasonable degree of certainty on the damage to MTI's goodwill, nor had he attempted to do so. (Breeden Dep. 108:20-109:2.) Accordingly, his opinion as it relates to MTI's loss of goodwill must be excluded.

MTI also maintains, albeit briefly, that Dr. Breeden's testimony will be helpful to the trier of fact insofar as he is testifying as an educating witness on the general economic principles and methods used in calculating future lost profits and business goodwill. Dr. Breeden, a professor of business economics, is clearly qualified to testify on general business methods and principles regarding future lost profits, business goodwill, and sales projections. But it is unclear at this point what relevance such testimony might have. If MTI does intend to offer such testimony, it should notify MLS as to what testimony it intends to offer, and MLS can decide whether it opposes it. Without knowing what testimony will be offered in this regard, the court is unable to issue a ruling.

Before concluding, the court must address MTI's request that the court stay a decision on MLS' motion to strike. After the court's grant of MTI's earlier motion to compel discovery, MTI argues that additional discovery provided by MLS and related entities has led to the need to further depose several witnesses. MTI contends that newly discovered documents and deposition testimony may be relevant to Dr. Breeden's opinion regarding MTI's loss of goodwill and provide a basis for

11

Dr. Breeden to supplement his expert report, which "may moot some, if not all, of MLS pending Motion regarding Dr. Breeden." (ECF No. 184 at 2.) If that occurs, MTI may seek leave to file a supplemental report. The court's decision is only as to the record as it currently exists. If MTI discovers new information that should have been disclosed previously, it may move for reconsideration. On the record as it now stands, MLS' motion is **granted**.

      **SO ORDERED** this   28th   day of June, 2013.

                                          s/ William C. Griesbach
                                          William C. Griesbach, Chief Judge
                                          United States District Court