# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARINE TRAVELIFT, INC.,

        Plaintiff,

    v.                                 Case No. 10-C-1046

MARINE LIFT SYSTEMS, INC.,

        Defendant.

## DECISION AND ORDER PARTIALLY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [135]

Plaintiff Marine Travelift, Inc. (MTI) filed this action on November 22, 2010, seeking relief against Defendant Marine Lift Systems, Inc. (MLS), its former distributor, for breach of contract and various tort claims. MTI asserts six causes of action: (1) breach of contract; (2) misappropriation of trade secrets; (3) misappropriation of confidential and proprietary information; (4) unfair competition; (5) tortious interference with contractual relationships; and (6) unjust enrichment/misappropriation of business value. (Am. Compl., ¶¶ 27-70, ECF No. 16.) MTI seeks compensatory and punitive damages, statutory fees and costs, an accounting, the imposition of a constructive trust, a declaratory judgment, and injunctive relief. (*Id.* at 16-21.) On February 20, 2013, MLS filed this motion for summary judgment on all claims. (ECF No. 135.) For the reasons set forth in this opinion, MLS's motion for summary judgment will be granted as to all of MTI's claims, with the exception of MTI's request for injunctive relief relating to the return of MTI's business materials.

# I. BACKGROUND

MTI is an international manufacturer of marine and industrial lift products. Marine lift products are used at marinas to carry, push, pull, lift, stack, or tier boats, and they come in a number of different styles, such as lift, crane, or gantry. Industrial lift products cater to other markets and are used to move other materials like pipes, beams, or cargo. MTI is an industry leader in the manufacture of marine boat hoists and also a significant player in the industrial lift market through its Shuttlelift product line. According to its director of international sales, MTI enjoys a 90-95% market share in the United States and a 50% market share of the international market. (ECF No. 138, ¶ 3; 138-2 at 2.) MLS is a Florida-based company that first became a distributor for MTI in 2002. MLS is owned by Gary Mansell, who also owns Tampa Forklift, Inc., and Industrial Mobile Cranes, Inc.(IMC), two businesses that sell non-marine lift products in and around Florida. Industrial Mobile Cranes sold Shuttlelift products from 2003 until 2007. (Def's Proposed Findings of Fact (DPFOF), ¶¶ 1-10, ECF No. 137.)

The contract at issue is the Distributor Agreement executed by MTI and MLS on September 26, 2007 (hereinafter the "Agreement"). (ECF No. 16-1.) Neither of Mansell's other companies, Tampa Forklift and IMC, are named in the Agreement, and Mansell signed only in his capacity as president of MLS. The Agreement superceded all prior distributorship contracts between the parties and granted MLS the non-exclusive right to purchase and sell MTI's marine lift equipment in Georgia and parts of Florida. MLS was prohibited by the Agreement from servicing competing manufacturers' products, and MLS was also required to maintain the confidentiality of MTI's trade secrets, confidential information, and proprietary business information. The Agreement contained a forum-selection provision and a choice-of-law clause subjecting MLS to the jurisdiction and law

of Wisconsin, and it prevented MLS from availing itself of Wisconsin's fair dealership law. (DPFOF 17-19.) The Agreement could be terminated at any time, and by either party, with a 30-day written notice of termination. (Agreement, Art. XII, ECF No. 16-1.)

It is undisputed that Mansell was unhappy with some of the terms of the Agreement and, while still a distributor for MTI, pursued business opportunities with other companies, including Mi-Jack, Inc., and Hoist Liftruck Manufacturing, neither of which were then in the marine lift market. Mi-Jack was an Illinois-based manufacturer of rubber-tire gantry cranes. (DPFOF 26.) Hoist was an Illinois-based manufacturer of material handling equipment, primarily forklifts. (*Id.* 47.) Since the inception of this action, both Mi-Jack and Hoist have entered, or taken steps to enter, the marine lift market. (Pl.'s Prop. Findings of Fact (PPFOF) at 38, 39, ECF No. 249.)

Upon learning of Mansell's efforts in or about March of 2010, MTI immediately stopped doing business with MLS and notified its customers that MLS was no longer its distributor. Eight months later, MTI started this action. MTI's central claim is that MLS breached the Agreement by disclosing MTI's trade secrets and its confidential proprietary and business information to Mi-Jack, Hoist, and other MTI competitors in an effort to develop another source of marine lifts that it could then sell on more favorable terms. MTI claims that as a result of MLS's breach of the Agreement and other wrongful conduct, it has been seriously harmed. Based on its most recent expert opinion, MTI claims MLS's conduct has resulted in a reduction in its overall value by as much as a 15%. (Supp'l Rpt. of David Birkhauser, ECF No. 247.)

MLS contends it is entitled to summary judgment on each of MTI's claims. MLS argues that despite three years of discovery, MLS has no evidence to support its claim that MLS disclosed trade secrets or other confidential information protected by the Agreement. In fact, MLS argues that MTI

3

has failed to identify with any specificity what information MLS disclosed that would qualify as a trade secret or otherwise confidential material protected by the Agreement. In addition, MLS argues that MTI has offered no admissible evidence that it has sustained any damages as a result of the disclosure of confidential information by MLS. Before turning to MLS's motion, however, it is first necessary to address MTI's argument that the motion is premature.

**MLS's Motion Is Not Premature**

At the close of its brief in opposition to MLS's motion, MTI argues that summary judgment should not be granted because of ongoing discovery issues. (Pl's Br. Opp'n 29-30, ECF No. 248.) MTI notes that it intends to complete three additional depositions, now reduced to two. One is a continuation of the deposition of John Flaska, the president of Hoist who has already been deposed twice, and the other is of a Hoist employee who had some contact with Mansell. After more than two years of discovery, more than eight months to respond to MLS's motion, and with trial set for less than two weeks, MTI's argument is, to say the least, unpersuasive.

MTI argues that its attempts to complete discovery in the case have been thwarted by MLS's failure to respond to its requests for production of documents. It notes that MLS produced over 700 new documents that MLS had previously claimed did not exist after the court granted its motion to compel on March 15, 2013. (Pl.'s Br. Opp'n 29, ECF No. 248.) These documents, MTI argues, necessitated the additional depositions that it is still attempting to complete. In addition, MTI argues that its discovery efforts have been hampered by MLS's designation of many of them as "confidential-attorneys' eyes only" pursuant to the Protective Order entered in the case. This designation, MTI argues, has prevented its representatives, including its in-house experts, from reviewing them and offering their analysis. (*Id.*) Finally, MTI notes that one of the witnesses it

4

seeks to depose, Martin Flaska, has been uncooperative and even hostile to its efforts to complete its examination. (*Id.*) Given these difficulties, MTI argues that it was unable to complete the discovery needed to fully respond to MLS's motion earlier.

It should be noted at the outset that MLS filed its motion for summary judgment on February 20, 2013. (ECF No. 135.) Although MTI was directed to respond to some of the issues MLS had raised earlier, it was not required to fully respond until October 18, 2013. Thus, MTI had almost eight months to respond. Moreover, MTI has not filed with the court a Rule 56(d) affidavit or declaration stating specifically the reasons it is unable to respond to MLS's motion. Instead, MTI includes at the end of its brief an explanation as to why it did not complete discovery previously and a general statement that "the Hoist depositions will relate to areas with direct impact on Defendant's present motion." (Pl.'s Br. Opp'n 30, ECF No. 248.) Missing is any explanation as to precisely what facts or information MTI believes it might uncover that would strengthen its argument in opposition to MLS's motion. Even aside from the fact that MTI has not filed a Rule 56(d) affidavit or declaration, however, the reasons it advances for delaying consideration of MLS's motion are not convincing.

MTI's efforts to blame MLS for its delay in completing discovery is based on a misreading of the record. It is true that MLS produced an additional 700 pages of documents after the court granted MTI's motion to compel, but the court did not find that MLS's failure to produce the documents earlier was unreasonable or in bad faith. In fact, MLS had claimed from the beginning that it had no obligation to produce documents that concerned Mansell's other two companies, Tampa Forklift and IMC, both of which had been dismissed from an earlier action for lack of personal jurisdiction. *See Marine Travel Lift, Inc. v. Mansell et al*, 10-C-0238, 2010 WL 4690991

5

(E.D. Wis. Nov. 12, 2010.) Order Granting Mot. to Dismiss, ECF No. 52. MLS had also claimed from the beginning that the Agreement dealt only with marine lift equipment, not with the non-marine industrial lifts that IMC sold, and that for this reason as well, MTI was not entitled to discovery of information concerning Mansell's other two businesses.

MLS's arguments were not without merit. Nevertheless, given the allegations of the complaint and the manner in which Mansell appeared to have run his businesses out of the same office, the court granted MTI's motion and later extended the discovery deadline to allow several additional depositions. On August 8, 2013, the court gave MTI forty-five days to complete the depositions it claimed it needed. (ECF No. 220.) In granting MTI's request for leave to depose these witnesses, the court noted that "having now construed the Agreement as non-exclusive as to both MTI and MLS, the relevance of much of the discovery MTI has sought is far less apparent." (ECF No. 220 at 10.) The court denied MTI's motion for payment of expenses under Fed. R. Civ. P. 37(a)(5) and observed that, if anything, the court was being "lenient" in granting MTI's request. (*Id.*)

On September 19, 2013, the parties submitted a joint stipulation reporting that Miller had been deposed but that Flaska and Kern's depositions needed to be rescheduled outside the 45-day period set by the court. (ECF No. 232.) The stipulation indicated that MTI's counsel was communicating with counsel for Flaska and Kern to find alternative dates. (*Id.*) The court approved the stipulation and granted MTI's request to extend the deadline for its response to MLS's summary judgment motion to October 18, 2013. MTI filed its response to MLS's motion for summary judgment on October 18, 2013, but MTI now claims that the court should hold off a decision because it might discover additional evidence in the two depositions it has yet to complete.

6

It is clear from the declaration of Attorney John Jay that MLS did all in its power to cooperate in rescheduling the depositions MTI insists are essential to its response. (ECF No. 251.) The court also concludes that MTI did not act with the kind of diligence one would expect, given the foregoing history and the scheduled trial date. Moreover, MTI has not requested an adjournment of the trial. Under these circumstances, no further delay is possible.

As to MTI's claim that by designating documents "confidential-attorneys' eyes only," MLS has made its analysis of evidence more difficult, the court notes that this entire case is about MTI's insistence that all of the information about its products and business must be kept confidential and out of the hands of its competitors in order for it to avoid substantial damage. Yet, MTI complains when MLS and the companies it does business with elect to maintain the confidentiality of their business information. If MTI wanted expert analysis of documents and information obtained in discovery from MLS and other companies, it should have hired outside experts who could themselves have been bound by the Protective Order to maintain confidentiality. Instead, MTI named its own personnel as experts. Whatever difficulties resulted, it appears, are due to its own choices.

In sum, the court concludes that MLS's motion for summary judgment is past ripe. To delay further would operate as a de facto denial of the motion. MTI has had more than enough time to complete any and all discovery needed to respond. Accordingly, its request that the court delay ruling on the motion is denied.

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Moreover, "when as in the present case, a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of his claim, the plaintiff is required by Fed. R. Civ. P. 56, if he wants to ward off the grant of the motion, to present evidence of evidentiary quality—either admissible documents or attested testimony, such as that found in depositions or in affidavits—demonstrating the existence of a genuine issue of material fact." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994). When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A. Disclosure of Trade Secrets and Confidential Business Information

From its inception, this case has offered more smoke than fire; while MTI is alleged to have acted "willfully and maliciously towards MTI and/or in intentional and deliberate disregard of MTI's rights (Am. Compl. ¶¶ 39, 47, 59)," evidence of specific misconduct by MLS or actual injury to MTI

8

has been noticeably absent. The allegations have also shifted and expanded over the course of the litigation, making MLS's response and the court's analysis difficult.[1] MTI is convinced that its former distributor breached the Agreement and engaged in tortious conduct that caused it severe and continuing damage. To be sure, MTI has reason to believe that Mansell, while MLS was still MTI's distributor, had embarked on a course of action that was contrary to MTI's interests. Under the circumstances, MTI's decision to terminate the Agreement was entirely reasonable, even though no reason was required. The issue presented by MTI's lawsuit, however, is whether MTI is entitled to relief from MLS beyond termination of the Agreement.

As noted above, MTI's central claim is that MLS disclosed MTI's trade secrets and other confidential business and proprietary information. But as MLS has observed from the beginning, MTI has for the most part been either unwilling or unable to specifically identify the trade secrets or confidential information it claims MLS disclosed. Instead, it has offered general descriptions of the type of information it believes the Agreement made confidential. (PPFOF ¶¶ 52-54, ECF No. 249.) That will not do. For the reasons that follow, each of MTI's claims fails as a matter of law on the undisputed facts before the court.

### 1. Misappropriation of Trade Secrets

Wisconsin, like most other states, has enacted a version of the Uniform Trade Secrets Act, Wis. Stat. § 134.90 (2011-12). The Act defines a trade secret as "information, including a formula,

---

[1] The difficulty is compounded by MTI's failure to properly respond to MLS's proposed findings of fact and its failure to properly comply with the local rules in offering its additional proposed findings. Instead of simply admitting or denying MLS's proposed findings, MTI frequently adds extraneous facts to its response. And its additional proposed findings continually violate the rule requiring "short numbered paragraphs" and frequently lack evidentiary support. *See* Civil L. R. 56.

9

pattern, compilation, program, device, method, technique or process to which all of the following apply:

> 1.) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2.) The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances."

Wis. Stat. § 134.90(1)(c). Thus, to show that particular information is a trade secret, a plaintiff must demonstrate that it is valuable, not known to others who might profit from its use, and has been handled by means reasonably designed to maintain secrecy.

Even before demonstrating these elements, however, a plaintiff must first identify with specificity the trade secrets it accuses the defendant of misappropriating. *IDX Sys. Corp. v. EPIC Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). It is not enough for a plaintiff to assert, as MTI does here, that among the information the defendant had access to are various trade secrets and then leave it to a jury to decide which items of information were disclosed and whether they fit the statutory definition of a trade secret. It is unreasonable and unfair to force a defendant to trial without even knowing specifically what information the plaintiff claims constitutes the trade secrets the defendant is alleged to have misappropriated. It is unreasonable because if a plaintiff cannot identify the information the defendant disclosed and demonstrate that it can offer evidence from which a jury could conclude the information constitutes a trade secret, there is no need for a trial. It is unfair because a defendant should not have to guess what information the plaintiff claims was disclosed and see for the first time at trial the evidence the plaintiff has to prove it fits the definition of a trade secret.

In *IDX Systems*, the district court granted the defendants' motion for summary judgment on the plaintiff's trade secret claim after concluding that the plaintiff "had failed to identify with specificity the trade secrets that it accuses the defendants of misappropriating." *Id.* The plaintiff had produced a 43-page description of the methods and processes underlying and the inter-relationships among various features making up its software package and argued it was specific enough. The Seventh Circuit agreed with the district court's conclusion that it was not and affirmed, noting that the plaintiff "has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret." *Id.* The plaintiff's assertion, the court noted, was not plausible, nor did it match up to the statutory definition. *Id.* The court acknowledged that the plaintiff's reluctance to be specific was understandable since "the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused." *Id.* Understandable or not, however, the court noted that "unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job." *Id.*; *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.").

In this case, MTI has provided even less specificity than the plaintiff in *IDX Systems*. MTI asserts as a proposed finding of fact that its trade secrets fall under two categories: engineering and manufacturing. It then lists under each general category several subcategories of information that constitute its trade secrets. Under engineering, for example, MTI lists: "structure information/design criteria;" "engineering calculations;" "steering information and specifications/design criteria;" "duty cycle criteria and information;" "performance testing data;" and "safety factors in machine and

11

components." (PPFOF ¶ 54, ECF No. 249.) Other than these general topics, however, MTI has failed to identify any specific document or item of information constituting a trade secret that it claims MLS disclosed. This falls far short of the specificity required by *IDX Systems*. Accordingly, MTI's misappropriation of trade secrets claim will be dismissed.

### 2. Misappropriation of Confidential and Proprietary Information

MTI has labeled its third cause of action as "misappropriation of confidential and proprietary information." (Am. Compl. at 13.) MTI contends that Wisconsin law recognizes such a tort, citing *Atlantic Mut. Ins. Co. v. Badger Med. Supply Co.*, 191 Wis. 2d 229, 528 N.W.2d 486 (Ct. App. 1995). The elements of such a claim, MTI contends are: (i) time, labor and money expended by plaintiff in the creation of the thing misappropriated, (ii) competition, and (iii) commercial damage to plaintiff." (Pl.'s Br. Opp'n, 22, ECF No. 248.)(citing *Mercury Record Prod., Inc. v. Economic Consultants, Inc.*, 64 Wis. 2d 163, 174, 218 N.W.2d 705 (1974), *cert. denied*, 420 U.S. 914 (1975)) MTI contends "[t]his tort exists independently of and is not precluded by the Wisconsin Uniform Trade Secrets Law." (Pl.'s Br. Opp'n 22, ECF No. 248.) It argues that a reasonable jury could conclude that MLS misappropriated MTI's confidential and proprietary business information.

In effect, MTI's claim for misappropriation of confidential business information is nothing more than an expanded trade secret claim. Neither *Atlantic Mutual* nor *Mercury Record* support MTI's argument that such a claim currently exists under Wisconsin law. *Atlantic Mutual* dealt with the question of coverage under the advertising injury provision of a commercial liability insurance policy. 191 Wis. 2d at 234-35. It provides no substantive guidance on any tort of misappropriation of confidential business information. And while *Mercury Record* does discuss misappropriation, it does so in a more general discussion of the only claim before it – unfair competition.

12

The issue in *Mercury Record* was whether the plaintiff had any remedy at common law to prevent the defendant from pirating its records. The defendant was alleged to have copied the music and sounds from the plaintiff's records to audiotapes and then sold them to the general public. 64 Wis. 2d at 167. At the time of the copying, the federal Copyright Act did not provide protection for sound recordings. *Id* at 178. The plaintiff brought suit and sought a temporary restraining order and preliminary injunction enjoining the defendant from continuing to pirate its records. The trial court dismissed the complaint for failure to state a claim and the plaintiff appealed. Relying on *Int'l News Svs. v. Associated Press*, 248 U.S. 215 (1918), the Wisconsin Supreme Court reversed and, joining with numerous other appellate courts across the country, held that the plaintiff's allegations stated a claim for unfair competition in the form of misappropriation of the plaintiff's product. 167 Wis. 2d at 173-75.

Here, by contrast, MTI's claim is that MLS stole MTI's business information, not its product. Information of the kind MTI claims MLS stole is given specific protection, if at all, as a trade secret, as defined by § 134.90(1)(c), or by contract. There is no separate tort of misappropriation of confidential business information under Wisconsin law that applies to non-trade secret information. *See Minuteman, Inc. v. Alexander*, 147 Wis.2d 842, 853, 434 N.W.2d 773 (1989) (noting that the enactment of the Wisconsin version of the UTSA in 1986 displaced the previously controlling common law definition of a trade secret). To treat *Mercury Record* as creating a tort of misappropriation of confidential information separate and apart from misappropriation of trade secrets would make § 134.90(1)(c) redundant. Why would the legislature adopt a uniform definition of trade secrets if it intended to leave in effect a broader common law definition of confidential business information that already existed?

13

This is not to say that MLS's alleged disclosure of confidential business information may not be actionable under some other theory of liability. In *Burbank Grease Svs., LLC v. Sokolowski*, the Wisconsin Supreme Court held that the Wisconsin UTSA did not preclude other civil remedies – in that case, breach of duty of loyalty and interference with business relationships – that sought damages resulting from the disclosure or misuse of confidential business information. 2006 WI 103, ¶¶ 10, 23, 294 Wis.2d 274, 717 N.W.2d 781. But *Burbank Grease* did not create any new civil remedies. It simply held that other existing civil remedies were not preempted by Wisconsin's version of the UTSA.

Since Wisconsin does not recognize a claim of misappropriation of confidential and proprietary information as a separate and independent tort, MTI's claim will be dismissed. It should be noted, however, that the result would be the same even if Wisconsin did recognize a tort of misappropriation of non-trade secret confidential and proprietary information. For such a claim would suffer from the same defect as MTI's misappropriation of trade secret claim. MTI has failed to specifically identify what information MLS disclosed that it claims constitutes non-trade secret confidential and proprietary information. Absent such information, it is no more fair and reasonable to require MLS to defend against this claim than MTI's claim for misappropriation of trade secrets. Accordingly, summary judgment is granted on MTI's claim for misappropriation of confidential and proprietary information.

### 3. Breach of Contract

MTI did not rely solely on Wisconsin common or statutory law to protect its interest in maintaining the confidentiality of its business information. It also included a broad and lengthy

14

provision governing confidentiality in the Agreement. Article X of the Agreement states in pertinent part:

> **X. CONFIDENTIALITY.** All Equipment sold to Distributor by Company and all software, drawings, diagrams, specifications, catalogs, literature, manuals and any other materials, written or electronic, including those contained in the proprietary password-protected website, furnished by Company to Distributor at no charge or for a fee, relating to the design, use, promotion, sales and service of the Equipment or in any way referencing Company's financial resources, distributors, distributors' customers, market, market share, marketing techniques or strategies, cost and pricing data, long-range or short range strategic and competitive plans and/or any other materials containing trade secrets of Company, shall remain confidential and shall constitute proprietary materials of Company. Distributor agrees to treat such information as confidential and the proprietary property of Company. Distributor at no time shall acquire any rights in the design of the Equipment or the related materials except to use such information solely for the purposes of promoting, selling and servicing the Equipment during the term of the Agreement. Distributor shall not copy the design of any Equipment or related materials for its own benefit or for the benefit of any other party. The covenants contained in this section shall remain effective throughout the term of this Agreement and thereafter unless specifically waived by Company. For the purposes of this Agreement, information that would otherwise be considered confidential information will not be so considered if:
>
>> A. such information is already known to the general public or to a third party through no wrongful act on the part of Distributor;
>> B. such information has been rightfully received by Distributor from a third party without restriction on disclosure and without breach of this Agreement;
>> C. such information has been independently developed by a third party;
>> D. such information has been approved for release by Company's written authorization;
>> E. such information has been publicly disclosed pursuant to a requirement of a governmental agency or law; or
>> F. such information has been incorporated within a patent issued to a third party not related to Company and through no wrongful act by Distributor.

(Agreement, Art. X, ECF No 16-1.) MTI alleges that MLS breached this provision of the Agreement by disclosing to representatives of Mi-Jack and Hoist MTI's confidential business information in an effort to wrongfully compete against MTI. (Pl.'s Br. Opp'n at 7, ECF No. 248.)

15

Here again, MTI's allegations are, for the most part, vague and unsupported by specific evidence. As with its trade secret claim, MTI lists entire categories of information that it accuses MLS of disclosing. To the extent MTI has failed to specifically identify the allegedly confidential information it claims MLS disclosed, its breach of contract claim suffers from the same defect as its misappropriation of trade secrets claim. It is, of course, MTI's burden to prove its claim that MLS breached the confidentiality provision of the Agreement by disclosing MTI's confidential materials, "written or electronic," as described in Article X of the Agreement. MLS cannot defend against claims that it disclosed confidential information without knowing specifically what confidential information it is accused of disclosing. Obviously, not all of Mansell's knowledge of the marine lift industry is covered by the Agreement. Information he obtained from other sources, or that is already known by a third party, is expressly excluded. *See* Agreement, Art. X, §§ A. and B. Thus, MTI's allegations that MLS disclosed entire categories of information are both too vague and too inclusive. They cannot survive summary judgment.

To the extent MTI even attempts to provide specifics, only three of 61 paragraphs of MTI's proposed findings of fact even purport to provide evidence that MLS disclosed information that falls within the broad confidentiality provision of the Agreement. In Paragraph 33, MTI states that Martin Flaska, Hoist's president, confirmed that "Mr. Mansell had given MTI information, including pricing, equipment drawings and specifications, and offered to show MTI machine drawings to Hoist for the purpose of helping Hoist compete against MTI by developing and selling a marine lift equipment product line." (PPFOF ¶ 33, ECF No. 249.) In Paragraph 35, MTI states that Mansell provided information to Daniel Heraty, Mi-Jack's Executive Vice-President, about one of MTI's lifts, the 100 BFMII, in the form of answers to a questionnaire that Heraty sent him. (*Id.* ¶ 35.) And

16

in Paragraph 42, MTI states that Mansell sent an MTI customer packets of information comparing pricing and specifications for a 100-ton MTI gantry crane with a 100-ton gantry crane manufactured by Hoist in an effort to convince the customer to purchase the Hoist product. (*Id.* ¶ 42.) Each of these proposed facts, however, suffers from one or more of the following defects: it is unsupported by the evidence cited, lacks the specificity required, or is irrelevant.

MTI's assertion that Mansell gave Flaska pricing, equipment drawings and specifications for MTI's equipment is not supported by admissible evidence. MTI cites to the declaration of Erich Pfeifer, its President, which states that in April 2010, Martin Flaska told him and other MTI representatives that Mansell had provided "MTI marine lift equipment information and machine specifications to Hoist for the purpose of allowing Hoist to compete against MTI in the marketplace and to prepare sales quotations." (Decl. of Erich Pfeifer ¶ 8, ECF No. 206.) But Pfeifer's statement about what Flaska told him is inadmissible hearsay. Fed. R. Evid. 802. MTI also cited to an unsigned affidavit prepared by Stephen Pfeifer, MTI's then-president and CEO, on MTI's stationary to confirm their conversation. (ECF No. 206-2.) But Flaska never signed the affidavit, and when shown the Affidavit at his deposition, he stated that the statements it contained were not accurate. (ECF No 282-1 at 129-36.)

MTI offers various arguments that Flaska's statements, as recounted by three of its officers, are admissible through the testimony of those officers, each of whom was present at the time Flaska is alleged to have made the statements. Specifically, MTI argues that Stephen Pfeifer's notes of his conversation with Flaska are admissible as present sense impressions under Rule 803(1), as a recorded recollection under Rule 803(5), or as business records under Rule 803(6). (ECF No. 282.) But the hearsay at issue consists of the alleged out-of-court declarations by Flaska, which clearly do

17

not constitute present sense impressions, recorded recollections or business records. Absent an exception to the rule against hearsay, one witness is not allowed to recount in his testimony the out-of-court statements of another, regardless of whether he claims he kept notes of the conversation in which the statements were allegedly made.

MTI also argues that Flaska's alleged statements are admissible as non-hearsay statements by an opposing party under Rule 801(d)(2) or as statements against interest under Rule 804(b)(3). But Flaska is not a party to the lawsuit between MTI and MLS. He is not even aligned with MLS. MTI contends that Flaska made the alleged statements during discussions with MTI officers in an effort to convince them to drop what he regarded as a baseless suit against his company. The fact that he succeeded in convincing MTI to dismiss the suit against his company is a strong indication that the statements, if made by him, were not against his interest in any meaningful sense. Finally, the only witnesses to the alleged statements are individuals with a strong interest in the outcome of the litigation that is adverse to MLS. Under these circumstances, even the residual hearsay exception under Rule 807 is not available. Finally, given the vague description of the information Mansell is alleged to have disclosed, even assuming the alleged Flaska statements were admissible, the result would be the same. The evidence is insufficient to support a finding that MLS breached the confidentiality provision of the Agreement by disclosing material to Hoist.

As to MTI's claim that Mansell disclosed confidential information to a customer in an effort to sell a Hoist gantry crane, once again MTI has failed to provide evidentiary support for its proposed finding. MTI contends that the proposed transaction was with PCL Civil Contractors, an MTI customer, and that in an effort to sell PCL a Hoist gantry crane, Mansell disclosed information concerning MTI's equipment. The deposition testimony cited by MTI, however, does not support

its assertion. Gary Fenton, the PCL employee involved in the transaction, denied that he received anything from Mansell regarding MTI. He recalled Mansell comparing Hoist's product to another, but did not recall if the other manufacturer was MTI. (ECF No. 224-7 at 37-39.) Given this testimony, it is clear that MTI lacks evidentiary support for its contention that Mansell breached the confidentiality provision of the Agreement by disclosing confidential materials to PCL. Even aside from this problem, the transaction involved a gantry crane, which is an industrial lift, not a marine lift. MLS did not sell industrial lifts. The transaction in question was being handled by IMC, one of Mansell's other companies that was not a signatory to the Agreement. Mansell had been selling MTI's industrial lifts through IMC until IMC cancelled its agreement with MTI shortly before MLS entered the Agreement. Thus, even if a disclosure of confidential information was made, it was not by MLS. Whether, as MTI contends, IMC is liable as an alter ego of MLS is not before the court since IMC is not a party to this action and the court has no jurisdiction over it.

As to Mi-Jack, the only specific evidence MTI offers to support its claim that MLS breached the confidentiality provision of the Agreement is a questionnaire that Mansell and his then-employee Harris went over with Heraty. (ECF No. 103-7.) Mansell and/or Harris apparently provided answers to questions Heraty had about MTI's 100 BFMII, such as: "What types of ground conditions are typical for this machine?"; "If pot holes exist, what is the typical maximum depth of the pot hole?"; "What is the typical number of lifts per day/year?"; "What percentage of the lifts are at full capacity?"; "Does the hoist angle change with the weight of the boat?"; and "Are there instances where 100MT is lifted at 31 degree hoist angle?" (*Id.*) But MTI offers no argument or explanation as to why the information provided in the questionnaire constitutes confidential material within the meaning of the Agreement. The questionnaire itself does not constitute "written or electronic"

19

material owned by MTI as described in Article X of the Agreement. It also seems likely that the information provided would have been known by any third party who had purchased or worked with MTI's 100 BFMII. Thus, this evidence too is insufficient to satisfy MTI's burden of establishing that MLS breached the confidentiality provisions of the Agreement. Finally, even assuming the disclosure of information reflected in the questionnaire did constitute a breach, MTI has presented no evidence that it sustained any damage as a result. As explained below, this fact alone is fatal to all of MTI's claims.

### 4. Damages

Whether a claim sounds in tort or in contract, in order to get to trial a plaintiff must proffer some evidence that it sustained actual damages. *See Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 17, 270 Wis. 2d 146, 677 N.W.2d 233 (noting that "a tort claim is not capable of present enforcement . . . unless the plaintiff has suffered actual damage"); *Matthews v. Wisconsin Energy Corp. Inc.,* 534 F.3d 547, 557 (7th Cir. 2008) ("Even if the delay fell short of Wisconsin Energy's obligations, Matthews has not shown that this delay damaged her in any way, a prerequisite to stating a claim for a breach of contract."); *see also Central Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne*, No. 09-C-0131, 2013 WL 501419, at *7 (E.D. Wis. Feb. 11, 2013) ("It would be patently unreasonable to allow the Authority to sue CTE for breach of contract and present its claim to a jury if the only damages that could possibly be assessed are nominal damages—in other words, no more than one dollar. Given the costs of litigation, especially litigation over a project of this magnitude, allowing the case to proceed where the plaintiff seeks only nominal damages would be a massive waste of resources, both those of the parties and the court."). The measure of damages in a tort case is actual harm to the plaintiff's person, property, or interests, and this harm must have

20

already occurred or be "reasonably certain" to occur in the future. *Tietsworth*, 2004 WI at ¶ 17, 269 Wis. 2d 109, 675 N.W.2d 470. In a contract case, "[d]amages are ordinarily measured by the expectations of the parties," *Handicapped Children's Educ. Bd. of Sheboygan Cnty. v. Lukaszewski*, 112 Wis. 2d 197, 206, 332 N.W.2d 774 (1983), and the most appropriate measure of damages in this case is lost profits.

Although MTI contends that MLS caused it great harm by disclosing MTI's legally protected information with competitors, it has failed to offer admissible evidence of actual loss. Ironically, MTI required MLS to acknowledge in the Agreement that "injury and damage [resulting from disclosure of confidential information] could not be readily ascertained or valued and, in any event, would not be adequately compensable in money damages, and that Company, its successors and assigns therefore, would have no adequate remedy at law in such event." (Agreement, Art. X, ECF No. 16-1.) Based on its acknowledgment of this fact, MLS agreed that MTI would be entitled to immediate injunctive relief in any court of competent jurisdiction enjoining MLS from making such disclosures. (*Id.*) While MTI included a claim for injunctive relief in its complaint, it never made any request for a temporary restraining order or preliminary injunction. Of course, the fact that damages caused by disclosure of confidential information may be difficult to prove does not mean that a plaintiff who claims to have been harmed by such disclosure is not entitled to bring suit for what damages can be proven. But the law remains it is the plaintiff's burden to prove damages. MTI has failed to present admissible evidence that it sustained damages here.

First, MTI has failed to provide evidence of present or past harm sufficient to satisfy the damages element of a tort or contract claim. MTI cites only one transaction in which it contends it was forced to give a discount because of MLS's wrongful actions. (Pl's Resp. to DPFOF ¶ 110, ECF

21

No. 237.) MTI contends that it had to give a customer called Skipper Bud's a $54,000 discount because Mansell had given Flaska MTI's pricing and profit information prior to the deal, allowing Hoist to bid lower than MTI on the transaction. (*Id.* ¶ 100.) Skipper Bud's is a family-owned business that owns and operates marinas in 23 locations, including Winthrop Harbor, Illinois. It is undisputed that MTI gave Skipper Bud's a discount on its purchase of a new boat hoist in 2011, but there is no evidence that MLS had anything to do with that discount. William Wood, the service manager who was tasked with the job of purchasing the new 75-ton boat hoist, testified that he knew he would have to purchase the hoist from MTI since MTI "pretty much has a lock on this market for boat hoists." (Wood Dep. 80:21-22, ECF No. 138-8 at 36.) In an effort to impress his bosses and get the best possible price, Wood said he led MTI to believe he was negotiating with Hoist for the equipment. Wood testified that Flaska had previously told him that Hoist was considering manufacturing boat hoists, and Skipper Bud's had previous purchased other kinds of equipment from Hoist. By leading MTI to believe Hoist was proposing to construct the boat hoist, Wood testified that he was able to negotiate a better price with MTI. Wood testified, however, that neither Mansell, nor MLS had anything to do with the transaction. (*Id.* at 96-97, 72.) In the face of this direct evidence, MTI offers nothing more than speculation based on the inadmissible Flaska statements. This is not enough.

MTI has also failed to point to other business opportunities lost as a result of MLS's communications with other companies. MTI contends that in November of 2009, Mansell utilized MTI's business information while preparing a quote on behalf of Hoist for PCL Civil Contractors. (PPFOF ¶ 42, ECF No. 249.) However, PCL never purchased the 100-ton gantry crane it had considered purchasing from Hoist. (Pl's Resp. to DPFOF, ¶ 67, ECF No. 237.) Similarly, MTI

22

contends that Mansell provided a quote to a company in Korea on behalf of Hoist, but MTI does not offer evidence that any sale was made or that Mansell shared MTI's confidential information with the Korean company. (*Id.* ¶ 68.) MTI also alleges that Mansell contacted M2 Lease Funds to obtain financing to develop a competitive product, but MTI does not allege that Mansell successfully obtained financing, and in fact, M2's CEO has stated that "there's no way [he] would ever provide financing" for a product Mansell seeks to manufacture. (PPFOF ¶ 40, ECF No. 249.) As noted above, MTI also alleges that MLS shared information with Mi-Jack regarding MTI's "100 BFMII," a particular marine lift product. (PPFOF ¶ 35, ECF No. 249.) But while MTI contends that MLS shared information regarding some of the attributes and capabilities of the 100 BFMII, MTI does not allege that Mi-Jack used this information to produce and sell a BFMII product. Moreover, MTI does not even point to specific information disclosed and explain how it was non-public information that could have been used to develop a competing product line.

Finally, MTI contends that MLS recently began working with Mi-Jack to sell a marine lift product to Viking Boat Works, a customer of MTI. However, the court noted in its July 17, 2013 order denying MTI's motion seeking access to the details of the proposed transaction that no sale had been made and that business initiated by MLS almost three years after the Agreement was terminated is not relevant to MTI's claims in this lawsuit. (*See* ECF No. 214.) Although it was not clear at the time, MTI apparently wanted to disclose the details of the sale and equipment to its own experts, presumably so that they could determine whether it appeared MTI and/or Mi-Jack were using any of MTI's confidential information. But the experts to whom MTI wanted MLS to disclose the information were all MTI employees or principals. As the court pointed out above, given MTI's own efforts to prevent disclosure of its proprietary information, it made no sense to order disclosure

23

of sensitive MLS/Mi-Jack information to MTI. If MTI wanted to analyze its competitors' product and price information in an effort to show that MLS had disclosed its confidential information, MTI should have hired an outside expert who could have been granted access under a protective order. MLS cannot be faulted for MTI's failure to retain the kind of experts that might have been granted more complete access to the sensitive information it insists is relevant to its claims. In any event, MTI has produced no evidence that it lost money or that MLS gained money in any transaction as a result of the alleged disclosure of confidential information.

MTI also asserts that it has suffered harm because MLS failed to remove MTI's name, proprietary logo, and other information from its website after termination of the Agreement in 2010. (PPFOF ¶ 41, 47, ECF No. 249.) Again, MTI does not allege that it has lost any of its customers, nor does it identify any transactions that were influenced by MLS's continued use of its information. Tampa Forklift employee Mark Selecky testified that he continued to pass out business cards with MTI's name on them as late as 2012, but even if the court assumes that Tampa Forklift is MLS's alter ego, as MTI contends, MTI has still not presented evidence that Selecky stole any business away from MTI. (*See* Selecky Dep. at 8-12, ECF No. 243-12.) Selecky admitted that he solicited business at the Tarpon Springs boat yard in Florida, but he also stated that he was not able to obtain any service work at that site. (*Id.* at 9.) MTI further alleges that MLS has stolen business leads by posting MTI's information on its website, but it fails to support this allegation with evidence in the record and does not identify any business opportunities affected by MLS's allegedly misleading website. (PPFOF ¶ 47, ECF No. 249.) MTI contends that MLS failed to remove Dale Harris' name from its website after Harris left MLS and started working for MTI. (*Id.*) But again, MTI does not identify particular communications or transactions affected, and without such information, MTI has

24

no basis to argue that MLS should have "forwarded its website-based customer inquires to Mr. Harris to MTI." (*Id.*)  In sum, MTI has failed to point to any specific transactions that provide evidence of actual harm to MTI.

MTI has also failed to present evidence of future harm.  MTI first attempted to introduce the expert report of Dr. Charles Breeden.  (*See* Breeden Report, ECF No. 127-4.)  Dr. Breeden opined that MTI had projected lost profits in the range of $563,833 to $4,085,000 based on the assumption that MLS's disclosures would impact 26% of MTI's worldwide sales.  (*Id.* at 3.)  This assumption was based on the percentage discount MTI gave Skipper Bud's in 2011 allegedly as a result of MLS's disclosure of its proprietary information to Hoist.  (*Id.* at 4.)  MLS moved to strike Dr. Breeden's report, and the court granted the motion, finding that Dr. Breeden's opinions were speculative and failed to satisfy the *Daubert* standard.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  (ECF No. 195 at 6-11.)

MTI now attempts to "supplement" the record in an attempt to show future harm.  MTI has filed supplemental expert witness designations for Erich Pfeifer, Steven Pfeifer, Peter Kerwin, and Stephan Chayer, and it has filed a supplemental written report of David Birkhauser.  (ECF No. 247.) The supplemental disclosures present a previously undisclosed damages theory based on MTI's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) value.  The disclosures contend that as a result of MLS's wrongful conduct, a hypothetical "strategic buyer" interested in purchasing MTI would insist upon a discount of at least 15%, causing millions of dollars in damage to MTI.  (*See, e.g.*, Supplemental Disclosure for Stephan Pfeifer at 1, ECF No. 247.)  The purpose of supplemental expert disclosure is to correct inaccuracies or to supplement the record with information that was not previously available.  But "[a]ttempts to introduce a new methodology after

25

the deadline for expert disclosures may be rejected by the district court." *Estate of Cape v. United States*, No. 11-C-0357, 2013 WL 4522933, at *5 (E.D. Wis. Aug. 27, 2013) (citing *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011). MTI's supplemental disclosures introduce a new methodology for calculating damages less than two months before trial and long after the deadline for disclosure of expert reports. Expert disclosures in this matter were due on January 25, 2012, and MTI has not sought leave to introduce a new methodology or expert report. (ECF No. 43.) The disclosures were therefore submitted far too late in the litigation to warrant consideration. Moreover, like the Breeden report, MTI's new theory of damages is grounded on speculation by MTI's employees and does not provide evidence that MTI is "reasonably certain" to suffer a future harm. MTI does not even explain how it determined that MLS has caused its EBITDA value to decrease by the figure of 15% or more. Since MTI's supplemental disclosures could not be used at trial, the facts contained within these documents will not be considered for purposes of deciding this summary judgment motion. Thus, MTI has failed to present any evidence of future harm in connection with MLS's communications with competitors and customers.

Finally, MTI notes that under Wisconsin law, a plaintiff need not prove actual damages with certainty. MTI cites the Wisconsin civil jury instruction on damages, Wis. JI-Civil 3725 (2013), and *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372-73 (7th Cir. 1990), as support for its contention. The jury instruction states that loss of future profits need not be shown with mathematical certainty. But the fact that certainty as to amount is not required does not mean that a plaintiff does not have to present some evidence. Indeed, the same instruction also states: "The burden to prove damages is not satisfied by evidence which merely shows that something might or might not exist or might or might not occur in the future. Mere possibilities leave the

26

resolution of the issue of damages for future profits in the field of speculation and conjecture to such an extent as to afford no basis for an inference; and, in the absence of at least such inference, there is no sufficient basis for awarding damages for loss of future profits." Wis. JI-Civil 3725.

In *Olympia Hotels*, the trial court had dismissed a breach of contract claim because the plaintiff "failed to produce evidence from which the jury could have determined what its damages were." *Id.* at 1372. The Seventh Circuit reversed, explaining:

> If Olympia failed to use its best efforts, a jury question, then it was a reasonable inference that the hotel would make less money for its owner, Racine. How much less was unclear. But as it was not Racine's fault that this quantity could not be estimated with precision, the jury was allowed to guess.

*Id.* at 1372-73. This case also contains a best efforts clause, but MTI misstates the applicability of *Olympia Hotels*. In *Olympia Hotels*, Racine hired Olympia to build and operate a hotel. *Id.* at 1366. The contract provided that Olympia would have complete control of the hotel and would use its "best efforts" to make the hotel a success. *Id.* After several years of operation, it was apparent that the hotel was not successful and Olympia gave Racine a notice of default. *Id.* Racine filed a counterclaim against Olympia, asserting that Olympia had not used its best efforts and had reimbursed itself out of the hotel's revenues for expenses not actually incurred in the hotel's operation. *Id.* at 1366, 1372. At trial, Racine had asked the jury to make Olympia refund a portion of the management fees that Racine had paid to Olympia under the contract. *Id.* at 1372. This was a speculative task because it was unclear what percentage of these fees should be refunded based on Olympia's failure to employ its "best efforts" to make the hotel a success. *Id.* Thus, it was clear that there were damages—a hotel in default and lost management fees—but the amount attributable to Olympia's conduct was unknown. In such a case, allowing the jury to provide a reasonable estimate

27

of damages serves the interests of justice.  *See Thorp Sales Corp. v. Gyuro Grading Co.*, 111 Wis. 2d 431, 441, 331 N.W.2d 342 (1983) (a defendant "should not be heard to assert that [the plaintiff] ought to recover nothing because the exact monetary loss caused by [the defendant's] breach cannot be ascertained.  This is like the plea of the proverbial miscreant who murdered his parents and then threw himself upon the mercy of the court because he was an orphan.").

Here, MTI has presented no evidence from which a reasonable jury could infer that it suffered *any* actual damages from the alleged disclosure of confidential information.  And MTI has presented no evidence that MLS did not use its best efforts to sell MTI equipment during the term of the Agreement.  In fact, MTI entered into a new distributor agreement with Harris, MLS's sales person, after it terminated MLS.  Harris was the person at MLS who was responsible for selling MTI equipment, and MTI has presented no evidence that he did not use his best efforts to sell MTI equipment.  The fact that Mansell was looking for other sources of equipment does not mean he did not use his best efforts to sell MTI equipment before the Agreement was terminated.  At the time, there was no other manufacturer whose marine lift equipment his company could sell.

Unlike the arrangement in *Olympia Hotels*, MTI did not pay MLS any fees for its services.  Under the Agreement, MLS was only authorized to buy equipment from MTI and then sell it at a higher price, keeping the "markup" as compensation.  (*See* Agreement, Art. VIII, ECF No. 16-1.)  As noted above, MTI has also failed to show that its business value has actually declined or that it lost money on particular transactions.  Since MTI has not demonstrated that it has actually been injured by any alleged disclosures of confidential information by MLS, summary judgment can be granted on each of the foregoing claims for this reason as well.  *See Black v. St. Bernadette Congregation of Appleton*, 121 Wis.2d 560, 566, 360 N.W.2d 550 (Ct. App. 1984) ("Because

28

damages are an essential element of a contract action, summary judgment dismissing Black's action was proper.").

## B. Other Contract Claims

In addition to its claims that MLS breached the Agreement by disclosing confidential information, MTI also alleges that MLS breached its duty to use best efforts in selling and promoting MTI's products, its implied duty of good faith and fair dealing, and its duty to comply with MTI's policies and procedures regarding the handling of customer accounts. The court has already noted that MTI presented no evidence that MLS failed to use its best efforts in promoting and selling MTI's equipment to prospective customers during the term of the Agreement in its discussion of the damage issue and will not repeat that discussion here. As to the implied duty of good faith and fair dealing, MTI argues that MLS "worked with MTI's competitors, customers and others, using MTI's business information, to try to create a marine lift equipment product line to compete with MTI and put MTI out of business." MLS also claims that Mansell made untrue and disparaging statements about MTI's products, services and its CEO, and invited others to sue MTI. This conduct, MTI alleges constitutes a breach of MLS duty of good faith and fair dealing.

Under Wisconsin law, each party to a contract owes a duty of good faith and fair dealing to the other. *See In re Chayka's Estate*, 47 Wis.2d 102, 107 n.7, 176 N.W.2d 561 (1970) ("Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." (internal quotes omitted)). This duty is essentially one of "co-operation on the part of both parties." *Ekstrom v. State*, 45 Wis.2d 218, 222, 172 N.W.2d 660 (1969). Whenever the cooperation of one party is required for the performance of the other, there is an implied duty to provide such cooperation. *Id.* There is likewise an implied promise on the part of each party not

29

to intentionally and purposefully take action that will prevent the other party from carrying out his side of the agreement. *Id.* While it is important to hold parties to their implied duty of good faith and fair dealing, courts must avoid adding obligations and conditions to contracts go beyond the agreement reached by the the parties. The implied duty of good faith is not a license to rewrite a contract.

Here, there is no dispute that Mansell was unhappy with the Agreement and wanted to find another manufacturer of marine lifts and hoists that his company could sell. The court already held in an earlier decision that the Agreement was not exclusive as to either party. While MLS was required to use its best efforts to sell MTI equipment, nothing prevented MLS from also selling other marine lifts. (Dec. and Ord. Grant Mot. Compel 6, ECF No 220.) MTI, on the other hand, reserved the right to sell directly to customers in MLS's territory and even to appoint other distributors in the same territory. (Agreement Art. I, ECF No. 16-1.) In addition, MTI could terminate the Agreement without cause on thirty days' notice. Given these terms, it is not surprising that Mansell wanted another source of marine lifts. Mansell admits that he encouraged other equipment manufacturers to enter the marine lift market. While it is understandable that MTI would not want competition, Mansell's actions would not constitute a breach of the Agreement absent evidence that he disclosed confidential information or engaged in other wrongful conduct to induce others to compete with MTI. As already noted, MTI has offered no admissible evidence that he did. It thus follows that Mansell's efforts to encourage other manufacturers to enter the marine lift market did not constitute a breach. And even if it was, MTI has offered no evidence that his actions were a cause of either Hoist or Mi-Jack taking steps to enter the market.

30

As to MTI's complaint that Mansell disparaged MTI, its equipment and its CEO, the only evidentiary support MTI offers for its assertion is a declaration by Harris that Mansell had made many derogatory remarks about MTI and its CEO to him. (Decl. of Dale Harris ¶ 12, ECF No. 246.) MTI offers no admissible evidence that the remarks were made to customers or other parties that could result in injury or damage to MTI. Again, MTI offers no evidence of injury or damage. While civility is certainly an important ideal in business relationships, contract law does not provide a remedy for every uncivil remark or action. Summary judgment will therefore be granted as to MTI's claim that MLS breached the implied duty of good faith.

MTI's remaining contract claims rest on its allegations that MLS mishandled several customer accounts during the term of the Agreement. MTI contends that MLS mishandled customer accounts on four separate occasions. To establish a breach of contract claim, MTI must prove that MLS failed to perform a duty under the Agreement. Wis JI-Civil 3053 (2013) First, summary judgment must be granted as to two claims because they do not involve transactions made under the Agreement. MTI claims that MLS breached MTI policies in regard to a $100,000 trade-allowance to Gate Concrete Products, but this transaction involved an industrial mobile gantry crane. (*See* PPFOF ¶ 22, ECF No. 249; Harken Decl., ¶ 12, Ex. I, Kerwin Dep. at 142, ECF No. 217.) Similary, MTI claims that MLS breached MTI policies with regard to a three unit order by Royal Concrete, but this transaction also involved an industrial mobile crane. (*See* PPFOF ¶ 24, ECF No. 249; Harken Decl., ¶ 12, Ex. I, Kerwin Dep. at 142, ECF No. 217.) MLS asserts that these transactions were made under MTI's separate distributor agreements with Industrial Mobile Cranes. MTI alleges that MLS and Industrial Mobile Cranes are alter egos, but nonetheless, the only distributor

31

agreement at issue in this lawsuit is the Agreement, and the Agreement only governs MLS's sales of marine lift equipment.  (DPFOF, ¶ 7.)

MTI also contends that MLS breached MTI policies in regard to a non-refundable equipment order deposit of over $30,000 by Island Packet Yachts.  (PPFOF ¶ 23, ECF No. 249.)  MTI alleges that MLS did not follow the contractual requirements for order submission and did not properly communicate to the customer that its $30,000 down payment was non-refundable, as required by the Agreement.  (*See* Agreement, Add. C.)  MTI refunded the $30,000 to Island Packet Yachts, noting in a letter dated June 20, 2007, that it was refunding the money in part because "it had come to MTI's attention that MLS "may not have properly informed you of the non-refundable nature of your deposit."  (*See* Harken Decl., ¶ 10, Ex. H, ECF No. 227-8.)  This claim also fails because MTI offers no admissible evidence that MLS did not inform the customer that the deposit was non-refundable. In fact, it is appears from MTI's letter to the customer that there were several other reasons MTI elected to refund what it characterized throughout its letter as a "non-refundable deposit."  (*Id.*)  Moreover, at the time of the transaction, MTI told MLS that the decision to return the deposit to the customer was made by MTI "as an exception to our long-standing policy."  (ECF No. 227-9.)  MTI also warned MLS that "[s]hould this circumstance ever come up again, we would look to your company to manage the outcome."  (*Id.*)  Absent admissible evidence that MLS did not comply with the policy, summary judgment must be granted on this claim as well.

Finally, MTI contends that MLS did not provide equipment service for the North Florida Shipyards (NFS) deal in 2010.  (PPFOF ¶ 48-49, ECF No. 249.)  In 2009, MLS arranged for the sale of an MTI boat hoist to NFS at a purchase price of more than $3 million.  (*See* Unit Order Coversheet, Harken Decl., ¶ 3, Ex. A, ECF No. 132.)  As part of the final agreement between MTI

32

and NFS, MTI agreed to pay MLS a setup fee of $25,800. (*Id.*) MTI claims that "[b]ecause MLS did not install or service the equipment for NFS, MLS did not pay approximately $8,000 to $15,000 to the service technician to complete work on the sale. (PPFOF ¶ 49, ECF No. 249.) Again, MTI has failed to clearly define what damage it has incurred. The court is left to wonder whether MTI paid the service technician, and if so, how much was paid. In addition, this matter was already addressed in the court's order granting in part MLS's motion for summary judgment on count II of MLS's counterclaim. (*See* ECF No. 233.) The court observed that MTI effectively terminated the Agreement as early as March 2010 by telling customers that MLS would no longer be performing sales and service work on MTI equipment. (*Id.* at 5.) This action prevented MLS from performing any setup work on the NFS equipment, which was not scheduled to be delivered until July 2010. (*Id.*) In fact, the profit MLS anticipated from the set-up work forms part of its counterclaim against MTI. MLS did not breach its contract with MTI by not performing work that MTI prevented it from performing. Whether MTI's conduct constitutes a breach is yet to be determined.

It follows from the foregoing that summary judgment will be granted on all of MTI's breach of contract claims. Still, there is more.

## C. Other Claims

MTI has also asserted several other claims, some of which rest on many of the same allegations that are addressed above. For instance, MTI has asserted a claim against MLS for unfair trade practices in violation of Section 100.20(1) of the Wisconsin Statutes. The claim is based on MTI's allegation that MLS "used MTI's trade secret and confidential and proprietary information to the detriment of MTI and to the benefit of Defendant or other parties with which Defendant has a direct financial relationship, including affiliated corporations of Defendant with identical or similar

management and ownership by Mansell." (Am. Compl. ¶ 50, ECF No. 16.) In its brief in opposition to MLS's motion, MTI argues that MLS "breached its obligations to MTI by using MTI's contractually protected business information to benefit itself and others, including [MLS's] affiliated corporations." (Pl's Br. Opp'n 25, ECF No. 248.) MTI then references eleven paragraphs of its proposed findings of fact.

For the reasons already explained above, MTI's unfair trade practices claim lacks the evidentiary support needed to avoid summary judgment. Despite three years of discovery, MTI has still failed to come forward with any admissible evidence that MLS disclosed information protected under the agreement or Wisconsin statutory or common law. In addition, MTI has presented no admissible evidence that it sustained any damage as a result of the alleged disclosures. Summary judgment will therefore be granted on MTI's claim of unfair trade practices.

MTI's fifth cause of action is tortious interference with contractual relationships. To prevail on a claim of interference with contractual relations, a plaintiff in Wisconsin must prove the following five elements: "(1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere." *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999) (applying Wisconsin law), overruled on other grounds, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). To survive MLS's motion for summary judgment, MTI had to establish that there was a genuine issue of material fact as to each of these five elements. *See generally Common v. Williams*, 859 F.2d 467, 469 (7th Cir.1988) ("Summary judgment is properly entered in favor of a

34

party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof.").

Here, MTI has failed to even identify, let alone offer evidence of, even one contract or prospective contract in which MLS interfered. MTI has offered no evidence of any transaction or sale that it lost as a result of any conduct by MLS, wrongful or otherwise. MTI has also failed to present any evidence of loss or damage. For all of these reasons, MLS is entitled to summary judgment on this claim as well.

MTI's sixth cause of action is for "unjust enrichment/misappropriation of business value." To establish a claim for unjust enrichment, the plaintiff must prove three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of the benefit; and (3) the defendant retained the benefit, and it was inequitable for the defendant to do so without payment. *Puttkammer v. Minth*, 83 Wis.2d 686, 689, 266 N.W.2d 361 (1978). In support of this claim, MTI offers nothing but the unsupported argument of its attorneys. Critically, it offers no evidence that it conferred a benefit on MLS over and above what MLS was entitled to under the terms of the Agreement. In fact, the court has already granted MLS's motion for partial summary judgment on its claim that MTI failed to pay MLS a commission it was owed from a previous sale. In other words, the only evidence before the court suggests that MLS conferred a benefit on MTI that MTI has wrongfully retained. MTI has offered no evidence that MLS has benefitted from any conduct undertaken by it in connection with MTI. Accordingly, summary judgment will be granted on this claim also.

There remain MTI's claims for an accounting, a constructive trust, declaratory judgment and injunctive relief. It follows from what has already been said that MTI is not entitled to an accounting, a constructive trust, or declaratory relief. Its claim for injunctive relief depends upon

35

whether MLS has returned to MTI any and all confidential material in its possession.  Since that issue has not been addressed, MTI's request for such relief will remain.

## IV. CONCLUSION

For the foregoing reasons, MLS's motion for summary judgment (ECF No. 135) is GRANTED, except for MTI's claim for injunctive relief.  The Clerk is directed to set this matter on the court's calendar for a conference to address what if anything remains for trial.

Dated this  3rd  day of December, 2013.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

36